ROBERT L. BIGGIAM *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. THE BOARD OF TRUSTEES OF COMMUNITY COLLEGE DISTRICT NO. 516, Defendant-Appellant and Cross-Appellee.

Second District   No. 2—86—0226

Opinion filed April 10, 1987.

628

Craig S. Mielke and William C. Murphy, both of Murphy, Hupp, Foote, Mielke & Kinnally, of Aurora, and Vickie A. Gillio, of Waubonsee Community College, of Sugar Grove, for appellant.

Gilbert Feldman, of Cornfield & Feldman, of Chicago, for appellees.

JUSTICE UNVERZAGT delivered the opinion of the court:
This is an appeal and cross-appeal from the judgment of the circuit court of Kane County entered in an action brought by the plaintiff teachers who were dismissed as part of an economic retrenchment by the defendant, Waubonsee Community College (Community College District No. 516).

The trial court's decision was in favor of plaintiffs Newlon, Biggiam, and Moreland and against plaintiffs Vargas and Pigage. Plaintiff Martz dismissed her complaint prior to hearing, and she is not involved in this appeal.

Specifically, the court's order provided that under the provisions of section 3B—5 of article IIIB "Tenure" of the Public Community College Act (the Community College Tenure Act or Act) (Ill. Rev. Stat. 1985, ch. 122, par. 103B—5) and article VII, section (e)(1), of the collective-bargaining agreement between the faculty union and the defendant community college, Newlon was entitled to "bump" from Speech 100 teaching assignments, in order, any part-time teacher of Speech 100 and any probationary (meaning nontenured) or less senior teacher whose course load consisted solely of Speech 100. His compensation would be that of a full- or part-time teacher commensurate with his assigned course load.

Biggiam and Moreland were entitled to bump any part-time, probationary, or less senior teacher of welding, their compensation to be commensurate with the full- or part-time status of their employment as above. Moreland, having greater seniority, would have bumping preference over Biggiam. Compliance with the above portions of the court's order was to be effective at the commencement of the "next teaching period [fall, 1986]"; a stay of the court's order pending this appeal was entered by the trial court on June 18, 1986.

Vargas was entitled to bump, should any part- or full-time positions arise during the statutory recall period provided in section 3B-5 of the Act, only in regard to counseling positions as per article VIII, section B, of the collective bargaining agreement. She was found not qualified to teach psychology under the "Qualifications to Teach" agreement between the faculty union and the college.

Pigage was found to be nontenured and outside the protection of the Act.

The defendant board of trustees (the board) seeks reversal of the court's judgment as to Biggiam, Moreland, and Newlon and affirmance as to Vargas and Pigage except insofar as Vargas was found entitled to bumping rights, which the board asks be reversed. In the course of such reversals and affirmances, it asks we determine that: (1) section 3B—5 of the Community College Tenure Act refers only to full-time faculty members; (2) the collective-bargaining agreement covers and refers only to full-time faculty members; (3) that section 3B—5 of the Community College Tenure Act and the collective-bargaining agreement, when read together, refer only to full-time faculty members; (4) no full-time positions with the college existed for which plaintiffs were qualified; (5) the board was not required to gerrymander or combine part-time positions to create full-time positions for the teachers; and (6) it is the board which has the duty and the power to determine qualifications to teach and competency to render the service.

The teachers cross-appeal, contending that the court erred (1) by delaying the time of compliance to fall 1986; (2) in restricting Newlon's bumping rights to persons whose teaching assignments consisted solely of Speech 100; (3) in determining the compensation to be received by Newlon and Moreland since that issue is not determinable under the Act but, rather, under the collective-bargaining agreement, which provides for resolution of disputes by arbitration; (4) by failing to find Vargas competent to teach psychology; and (5) by failing to recognize the recall rights of Pigage under the Act.

After denying cross-motions for summary judgment, the cause proceeded to hearing. The court admitted in evidence the following "Stipulation of Facts" offered by the parties:

"1. That this stipulation is in addition to all undisputed facts in the affidavits previously filed by all parties hereto.

2. That this stipulation may be considered together with any testimony received by the Court. Any document previously provided to the Court may also be considered as evidence by the Court.

3. That the following is a statement of facts agreed upon by all parties.

## STATEMENT OF FACTS

A. The Defendant, BOARD OF TRUSTEES OF COMMUNITY COLLEGE DISTRICT NO. 516, is a duly authorized board existing under Article III of the School Code [sic] (Ill. Rev. Stats., ch. 122, par. 103—1, et seq.). The Defendant is a "board" within the meaning of the Community College Tenure Act (the "Act") (Ill. Rev. Stats., ch. 122, par. 103B—1, et seq.).

B. All plaintiffs are "faculty members" within the meaning of the Community College Tenure Act. Plaintiffs, BIGGIAM, MORELAND, NEWLON and VARGAS have tenure within the meaning of the Act. PIGAGE is nontenured. MARTZ has been voluntarily dismissed as a plaintiff herein.

C. Defendant, on February 19, 1985, by resolution (copy previously provided Court) moved to dismiss the six Plaintiffs and each received notice letters in conformity with par. 3B—5 of the Act. In response to the overall financial condition of the College, taking into account low enrollment, both generally and in particular programs, cost effectiveness of particular programs and efficiency of current full-time faculty staffing levels, the BOARD eliminated the six full-time teaching positions. There is no issue raised nor is it claimed that the BOARD acted with improper or unlawful motive.

D. The Waubonsee Community College Faculty Federation Local 2065 (the "Union") is the historically recognized collective bargaining representative for full-time faculty members regularly engaged in teaching, counseling or library services employed by the Defendant. All Plaintiffs are members of the Union.

E. In December, 1983, the Union and the Defendant agreed to a "Qualifications to Teach" agreement (copy previously provided Court).

F. The Union and the Defendant simultaneously negotiated "grandfather" clauses into their collective bargaining contracts which read as follows:

Article VII
(e) Determination of Teaching Assignments.
(i) Faculty members hired prior to the Board's adoption

on December 20, 1983, of the "Qualifications to Teach" shall not be adversely affected thereby in connection with the *teaching positions* held by those faculty members as of that date. [Emphasis added.]

Article VIII

(b) Counselors hired prior to the Board's adoption on December 20, 1983, of the "Qualifications to Teach" shall not be adversely affected thereby in connection with the *counseling positions* held by those faculty members as of that date. [Emphasis added.]

A copy of the 1984-1986 Collective Bargaining Agreement has been previously provided to the Court.

G. The number of part-time teachers employed by the Defendant for the 1985-1986 school year will be the same or less than were employed for the 1984-1985 school year and previous school years.

H. Full-time faculty members teach 14 to 16 credit hours per semester or approximately 30 credit hours per academic year. Full-time counseling faculty work 40 hours per week. At the beginning of the 1984-1985 school year, the Defendant had a total of 73 faculty members and 241 part-time members. The decrease in the number of full-time faculty members resulted from the retrenchment of the aforementioned six faculty members, the early retirement of six faculty members, and the voluntary resignation of two faculty members.

I. Part-time faculty members are engaged by a contract on a semester by semester basis, depending upon the course load, which in turn is dictated by student enrollment and student election of courses. During the 1984-1985 school year and in previous school years, part-time teachers have frequently taught many of the same courses that are also taught by regular full-time faculty members.

J. NEIL NEWLON—Newlon was hired full-time in the fall of 1979 expressly to build a theatre department, to build enrollments in theatre courses, and to build an active group of student participants. Newlon has a masters degree in theatre; he does not have a masters degree in speech.

The following chart illustrates Newlon's course load since spring 1983. This shows scheduled classes, classes which were cancelled or combined, and resulting reassignments to create a full course load.

632

NEWLON's SCHEDULE FOR 1982-1985

| | Scheduled | Cancelled | Combined | Reassigned |
|---|---|---|---|---|
| Spring 1983 | TH241.01 | | | |
| | TH244.01 | | | |
| | TH140.61 | | | |
| | TH242.61 | X | | SP100.08 |
| | TH141.01 | | | |
| | TH141.01 | | | |
| Fall 1983 | TH241.01 | | | |
| | TH244.01 | | | |
| | TH141.01 | X | | SP100.06 |
| | TH242.61 | X | | SP100.07 |
| | SP100.03 | | | |
| Spring 1984 | TH140.61 | X | | SP100.06 |
| | TH141.01 | | | |
| | TH241.01 | | TH241 & TH244 | |
| | TH244.01 | | | SP100.07 |
| | TH242.61 | X | | SP100.06 |
| | SP100.08 | | | |
| Fall 1984 | TH141.01 | | | |
| | TH241.01/244.01 | | | |
| | TH241.61 | | | |
| | SP100.03 | | | |
| | SP100.06 | | | |
| Spring 1985 | TH141.01 | | | |
| | TH241.01 | X | | SP100.62 |
| | TH244.61 | X | | SP100.04 |
| | TH244.01 | | | |
| | SP100.62 | | | |

The only speech course ever taught by Newlon is Speech 100, Fundamentals of Speech Communication. For the 1985 semester, the only theatre course is being taught by M. Bakalis, a part-time teacher who has a masters degree in theatre. For the fall 1985 semester, 12 sections of Speech 100 are being taught as follows: Three sections are being taught by J. Sprague, a senior tenured full-time faculty member; three sections each by S. Lane and D. Davis, part-time teachers who both have a masters degree in speech; two sections by M. Bakalis, a part-time teacher; and one section by K. Eineke, a part-time teacher. For the 1984 fall semester, seven sections

of Speech 100 were taught by part-time teachers.

K. ROBERT L. BIGGIAM and JAMES MORELAND—Both Biggiam and Moreland previously taught welding and never taught any other classes at Waubonsee Community College except for Moreland who taught blueprint reading for welders in six semesters between the 1979-80 and 1981-82 school years. For the fall 1985 semester, three welding classes totalling 11.1 credit hours were offered but two of these classes were cancelled due to insufficient enrollment. Only one welding class with a total load of 5.1 credit hours is being taught during the fall 1985 semester. This one welding class is being taught initially by Brian Murphy, a part-time instructor, who had previously taught welding on a part-time basis for all but one of the past eight years. Clint Vickers was recently hired to replace Mr. Murphy, who was unable to complete the semester. The only school year in which Murphy did not teach welding on a part-time basis during said eight years was during the 1983-1984 school year. During the fall 1984 semester, Biggiam and Moreland taught 30 credit hours of welding. For the fall 1985 semester, no blueprint reading class is being taught.

L. JUDITH VARGAS—Vargas was hired as a counselor by Waubonsee Community College in 1974 and has continued to work as a counselor throughout the period of time that she was employed by the College. Vargas taught on an overload basis one Psychology 100 course, the introductory psychology course, in three separate semesters. Vargas also taught on an overload basis Personal Development 146, a telecourse in career life planning. While Vargas developed a course outline for Child Care 181, she never taught this course and the course outline she developed has never been used by the College.

For the fall 1985 semester, ten sections of Psychology 100 were offered but one section was cancelled because of insufficient enrollment. The remaining nine sections are being taught as follows: Three sections are being taught by a full-time tenured faculty member in the Psychology Department, D. Murphy, who has a masters in psychology; one section is being taught by a full-time tenured faculty member who is more senior than Vargas, R. Gilkerson; and five sections are being taught by three part-time teachers, B. Tucker, M. Judd and G. Gates, all of whom have masters degrees in either psychology or educational psychology. For the fall 1984 semester, five sec-

tions of Psychology 100 were taught by part-time instructors.

One section of Personal Development 146 is being taught as a telecourse during the fall 1985 semester by M. House, a senior full-time tenured faculty member. While one section of Child Care 181 was scheduled for the fall 1985 semester, this class was cancelled due to insufficient enrollment.

Vargas does not have a masters degree in psychology or educational psychology. Rather, she has a doctor of education-counselor education.

M. JON PIGAGE—Pigage did not have tenure at the time of the Board's adoption of the reduction in force resolution. Pigage, who has a Ph.D. in biology, taught biology classes at Waubonsee Community College. For the fall 1985 semester, the following biology classes are being taught by full-time tenured faculty members: Biology 102, 121, 131, 132 and 216. While Pigage asserted that he was competent to teach Oceanus 102 (a telecourse) and Basic Nutrition 210, Pigage has never previously taught either course. For the fall 1985 semester, one section of Oceanus 102 is being taught by a part-time instructor, Dr. Thompson, who has a Ph.D. in science education, and one section of Basic Nutrition 210 is being taught by a part-time instructor, A. Khetartel, who has a masters degree in nutrition. For the fall 1984 semester, one section of Oceanus 102 was taught by a part-time instructor, Dr. Thompson, and one section of Basic Nutrition 210 was taught by a part-time instructor, A. Khetartal.

N. Telecourses are not normally part of an assigned load. Telecourses are considered, and have been handled, as extra duty. The pay for telecourses is different from the pay rate for regular sections of the same course. Telecourses are not part of a full-time faculty member's normal teaching load."

The foregoing stipulation of facts was supplemented with the testimony of four witnesses at the hearing. Ron Gilkerson testified on behalf of the teachers. He has been a faculty member at Waubonsee Community College since 1968 and has been the president of the faculty union since 1974. He explained that classes are first assigned by the deans of the college to the full-time faculty, then any extra classes are assigned as overload classes first to tenured faculty, then to nontenured faculty, and remaining classes, if any, to part-time instructors. For the fall 1985 semester, the college intended to offer more classes than were actually eventually taught. The decrease in the number of classes was due to a decreasing trend in enrollment.

Neil Newlon then testified on behalf of the teachers. He began teaching at the college in 1979 and received tenure in 1982. He was required to and did, in fact, have a master's degree in theatre. When he began teaching, speech and theatre were combined under the speech curriculum, and he taught several courses in that curriculum. In 1983, the speech and theatre curriculums were separated; with the exception of the introductory Speech 100 course, all the courses he taught in the combined curriculum were theatre courses after the curriculums were separated.

According to Newlon's affidavit in the record, college president Swalec offered him a fall, 1985, semester part-time teaching assignment consisting of three-fifths of a full load of speech courses. Newlon also averred that a part-time teacher assigned to teach children's theatre in the fall, 1985, semester did not have a master's degree in theatre and that to the best of his knowledge, the college permits part-time instructors to teach in subjects or disciplines in which they lack a master's degree.

The first witness called by the board was Dr. John Swalec, president of Waubonsee Community College. Dr. Swalec indicated that the college employs full-time faculty, full-time nontenured faculty, and part-time instructors. There was no increase in the number of part-time instructors between the 1984-1985 school year and the 1985-1986 school year. The college has approximately 60 full-time faculty members and some 200-plus part-time instructors. The use of part-time instructors is very common throughout the community college system in Illinois. Defendant's exhibit No. 1 admitted in evidence showed a breakdown of full- and part-time instructors for all Illinois community colleges on both a statewide and individual community college basis.

Dr. Swalec explained the many basic differences between full- and part-time instructors. Part-time instructors do not receive fringe benefits, do not have an obligation to have office hours for student advising, are paid a straight rate based on the number of hours they teach, receive only a semester contract, and are not signed to that contract, based upon determined need, until the beginning of the school semester in which they teach.

On the other hand, full-time instructors are required to maintain office hours, receive a contract in March for the following school year, are paid a salary based upon their experience and education, and are covered by the faculty union contract. The use of part-time instructors allows a great deal of flexibility in scheduling and allows the college to employ instructors with a great deal of specialization

in a very specific area. Waubonsee Community College is approximately at the State average of utilizing 40% part-time instructors based upon the total number of credit hours taught.

Defendant's exhibit No. 2 admitted in evidence was a statement which was given by Dr. Swalec to the board of trustees which outlined the reasons for the reduction in force which resulted in the termination of the plaintiff teachers. Dr. Swalec testified that there had been a significant reduction in the budget for the college and that this greatly affected personnel since salaries make up 72% of the total budget. In response to this economic situation, the college terminated nine full-time administrators and did not fill positions for many support and clerical staff. In addition to the fiscal problems, there was also a substantial reduction in student enrollment from a peak of 88,000 credit hours three years ago to the current level of 70,000 credit hours.

More specifically, welding classes dropped from 1,200 credit hours to only one course of 5.2 credit hours for fall, 1985. This affected plaintiffs Biggiam and Moreland, who taught only welding. Specifically as to Newlon, a study by the college showed that the lowest enrollment of any program was in the theatre program. Although a full load of theatre classes would be scheduled each semester, in fact only a little over one class of students would materialize. The board had determined in accordance with the established "Qualifications to Teach" that Newlon was not qualified to teach speech because he did not have a master's degree in speech. Newlon has taught only Speech 100 classes in the past. Dr. Swalec testified it would be very difficult to create a full-time position out of the existing Speech 100 classes.

Dr. Swalec testified that the retrenchment of the plaintiff teachers was an administrative necessity based upon the need of the college to maintain a balanced budget and to respond to community needs. The college assumes no contractual obligation to part-time instructors other than to fulfill the contract for the course they are to teach.

Although Pigage was nontenured, Dr. Swalec testified the board agreed to allow him recall rights in the event a position opened up within the two-year statutory recall period. With regard to Dr. Vargas, who was a counselor at the college, it was the judgment of the board that due to the dramatic decrease in enrollment, the college could not justify the need for as many counselors as it had previously employed. Dr. Vargas was the least senior counselor and, therefore, in accordance with State law and the union contract, it

was necessary to dissolve her position. Although Dr. Vargas had taught an overload class in psychology for three semesters ending in the summer of 1982, in the judgment of the board, based on the collectively bargained "Qualifications to Teach" agreement, she was not qualified to teach psychology because she lacked a master's degree in that area.

According to Vargas' affidavit in the record, full-time faculty members in addition to herself and part-time instructors taught psychology courses although they lacked a master's degree in psychology. Dr. Swalec testified that the compensation cost to the college is 2½ to 3 times greater for a full-time faculty member to teach a course than for a part-time instructor to teach the course.

The next witness called by the board was Dr. Carol Viola, who is the vice-president of educational affairs at the college. She started with the college in 1967 as a charter faculty member, then later held the positions of lead instructor, division chairman, assistant dean, and eventually vice-president. In 1983 Dr. Viola began a program review which included the collection of data concerning the cost efficiency and cost benefits of various curriculum offerings. This was in response to a mandate from the Illinois Community College Board to engage in a program review which included an examination of program enrollment and revenue generated by such programs. The end result was a document entitled "Waubonsee Community College Program Evaluation and Revenue Procedure Desk Audit—Cost Analysis," which was admitted in evidence as defendant's exhibit No. 3.

Specifically, the evaluation indicated that welding did very poorly in terms of credit hours generated. Also, the theatre department was at the bottom in that it had the fewest enrollments and the highest costs. With this evaluation, the administrative council and the various deans made recommendations to Dr. Swalec as to what faculty should be retrenched. This resulted in Dr. Swalec's recommendations to the board to eliminate the positions of the instant plaintiffs.

Dr. Viola testified there had been no increase in part-time instructors or any subdividing of programs in order to hire part-time instructors in the place of those faculty members retrenched; there was insufficient enrollment for the retrenched positions in the first place so there was no necessity to subdivide any position. Dr. Viola testified concerning the formulation of the "Qualifications to Teach" which was the result of collective bargaining and was adopted in December 1983. After the retrenched teachers were notified of their discharge and were asked to identify any other full-time positions

with the college that they were qualified to teach, Dr. Vargas indicated that she was qualified to teach psychology and Newlon identified Speech 100 courses as an option. Dr. Viola testified there were no positions open in either psychology or speech at that time. Under the collective bargaining agreement, if there was another full-time faculty member with less seniority in either of those positions, they could be bumped. Contract renewals for tenured faculty members are automatic; contracts of nontenured faculty members are renewed unless they are notified otherwise 60 days before the end of the term. Part-time instructors do not accumulate seniority.

Prior to the adoption of the "Qualifications to Teach" in December 1983 there had been some interdisciplinary transfers by faculty members at the college, but less than one-third of the faculty members transferred. Since the qualifications were adopted in December 1983, no full-time teacher had transferred from the field in which he or she had a master's degree to another field in which he or she did not have a master's degree, but such persons might teach one course in another field.

During the pendency of the instant cause in the trial court, the teachers furnished names to the board in order to demonstrate how the "grandfather" language (Stipulation, par. F) has been applied and implemented. Dr. Viola testified she cross-referenced the names with the college records. The cross-referencing revealed (a) one faculty member who, prior to December 1983, had transferred into a field in which he did not possess a master's degree and was permitted to continue teaching in that field after December 1983, and (b) six faculty members who, prior to December 1983, had taught one or more courses outside of the field in which he or she possessed a master's degree and were permitted to continue teaching those courses. Dr. Viola testified she received no reports from the department deans of other persons teaching outside the field of their master's degrees.

We consider at the outset the issue we believe is foremost in this appeal: whether section 3B—5 of the Community College Tenure Act (Ill. Rev. Stat. 1985, ch. 122, par. 103B—5) and/or the collective bargaining agreement to which the instant parties are subject create rights for faculty members only with respect to other faculty members or whether such rights may be asserted over part-time instructors as well. The board's contention is that such tenure rights as are provided for therein are applicable only as against faculty members, and the teachers' contention is that they are applicable as against part-time instructors as well.

The Public Community College Act (Ill. Rev. Stat. 1985, ch. 122, par. 101—1 *et seq.*) became effective July 15, 1965. "Article IIIB. Tenure" was added January 1, 1980, codifying the tenure rights of community college teachers. (Ill. Rev. Stat. 1985, ch. 122, par. 103B—1 *et seq.*) Section 3B—5 of the Community College Tenure Act provides:

"If a dismissal of a faculty member for the ensuing school year results from the decision by the Board to decrease the number of faculty members employed by the Board or to discontinue some particular type of teaching service or program, notice shall be given the affected faculty member not later than 60 days before the end of the preceding school year, together with a statement of honorable dismissal and for the reason therefor; *provided that the employment of no tenured faculty member may be terminated under the provisions of this Section while any probationary faculty member, or any other employee with less seniority, is retained to render a service which the tenured employee is competent to render.* In the event a tenured faculty member is not given notice within the time herein provided, he shall be deemed reemployed for the ensuing school year. For the period of 24 months from the beginning of the school year for which the faculty member was dismissed, *any* faculty member shall have the preferred right to reappointment to a position entailing services he is competent to render prior to the appointment of *any new* faculty member; *provided that no non-tenure faculty member or other employee with less seniority shall be employed to render a service which a tenured faculty member is competent to render.*" (Emphasis added.) Ill. Rev. Stat. 1985, ch. 122, par. 103B—5.

Section 3B—1 of the Community College Tenure Act provides one definition which is pertinent here:

" 'Faculty Member' means a full time employee of the District regularly engaged in teaching or academic support services, but excluding supervisors, administrators and clerical employees." Ill. Rev. Stat. 1985, ch. 122, par. 103B—1.

Article X, par. A, of the collective bargaining agreement provides:

A. Tenure shall be granted to faculty members in accordance with the Illinois Community College Act, Illinois Revised Statutes Chapter 103B—1, etc., and Appendix B of this Agreement, which includes tenure, evaluation of non-tenured faculty, dismissal of tenured faculty members for cause, and reduction

in number of full-time faculty members. Where remedies are provided under said statute, they shall be the exclusive means of resolving complaints or questions concerning tenure, including but not limited to appointment, dismissal and retrenchment of tenured faculty. Such matters shall not be the subject of a grievance, except where the statute does not provide for such remedies."

"Appendix B" referred to above provides the following pertinent definitions:

" *'Faculty Member'* means a full-time employee of the district regularly engaged in teaching or academic support services, but shall exclude supervisors, administrators and all supportive staff, including secretarial/clerical, data processing and physical plant staff.

\* \* \*

*'Tenure'* means continuous contractual employment unless dismissed for adequate cause or due to a decision of the Board to decrease the number of faculty members employed by the Board or to discontinue some particular type of teaching service or program.

\* \* \*

*'Full-Time Employment'* for the purpose of this tenure policy shall be defined as follows:

*Faculty Members*: Faculty members normally have a teaching load of at least 30 semester hour equivalents which equivalents shall include released semester teaching load hours for non-teaching duties. A teaching load of less than 30 semester hour equivalents per school year shall not be considered full-time employment.

*'Seniority'* means the length of continuous full-time employment as a faculty member as defined herein since the last date of hire as a full-time faculty member. Conflicts in seniority among faculty members with the same beginning date of continuous employment shall be resolved on the basis of the earliest date when the initial full-time contract of employment was approved by the Board". (Emphasis in original.) Exhibit "K", pages 17, 33, 34.

With regard to "Reduction in Number of Full-Time Faculty Members," appendix B of the collective bargaining agreement provides:

"The provisions of Chapter 122, Section 103B—5, Illinois Revised Statutes shall be applicable with respect to the dismissal

of a faculty member due to a decision by the Board of Trustees to decrease the number of faculty members employed by the Board of Trustees or to discontinue some particular type of teaching service or program.

Each tenured faculty member who is subject to dismissal due to a reduction in the number of faculty members employed by the Board of Trustees shall be given the opportunity prior to honorable dismissal to advise the Board of Trustees in writing of *any position(s), if any, held by non-tenured faculty members, or any other employees with less seniority, which such faculty member believes he/she is competent to fill,* together with the documentation upon which such belief is based. It shall be the responsibility of the Board of Trustees, acting on recommendations of the administrative staff, to determine whether or not the tenured faculty member is, in fact, *competent to render the services for the position or positions identified by the tenured faculty member.*" (Emphasis added.) Exhibit "K", at 39.

Initially, the board contends it is essential to bear in mind the distinction between a *position* and the *teaching of a particular course* in construing the Community College Tenure Act. It asserts the Community College Tenure Act was never intended to perpetuate teachers in positions where they are no longer needed nor to permit, under the guise of tenure, a teacher to move to a position for which he or she is unqualified under the terms of the collective bargaining agreement, or to force a board of trustees to create or gerrymander a position where none exists in order to satisfy a tenured teacher's demand for continued employment after his or her position has been eliminated. It contends the legislature's use of the language "competent to render a service" in the Community College Tenure Act was not meant to supplant the concept of being *qualified to fill a position* as that concept has been applied in numerous cases interpreting section 24–12 of article 24 of the School Code (the Teacher Tenure Law) (Ill. Rev. Stat. 1985, ch. 122, par. 24–1 *et seq.*) with the concept advanced by the teachers below, *i.e.*, that the Community College Tenure Acts' protection applies to any *course* that the protected faculty member is competent to teach or any other *identifiable service* which the faculty member is competent to render.

■■■ The primary rule of statutory construction is to ascertain and effectuate the legislature's intent. (*Waste Management of Illinois, Inc. v. EPA* (1985), 137 Ill. App. 3d 619, 627.) In doing so, a

court looks first to the statutory language itself, and if the language is clear, the court must give it effect and should not look to extrinsic aids for construction. (137 Ill. App. 3d 619, 627; *Board of Trustees v. Taylor* (1983), 114 Ill. App. 3d 318, 322-23.) But where differing interpretations are proffered, legislative intent must be determined from the reasons for the enactment and the purposes to be thereby attained, as well as the meaning of the words enlarged or restricted according to their real intent. *Verdeyen v. Board of Education* (1986), 150 Ill. App. 3d 915, 922; *Board of Trustees v. Taylor* (1983), 114 Ill. App. 3d 318, 323.

■■ Although the School Code has been found inapplicable to community college districts which operate under the authority of the Public Community College Act (Ill. Rev. Stat. 1985, ch. 122, par. 101—1 *et seq.*) (*Steinmetz v. Board of Trustees* (1978), 68 Ill. App. 3d 83, 86), when legislative intent is not clear it is proper to compare the statute in question with statutes concerning related subjects even though they are not strictly *in pari materia* (*Board of Trustees v. Taylor* (1983), 114 Ill. App. 3d 318, 323). Accordingly, the teachers urge construction of section 3B—5 of the Community College Tenure Act consistent with that of the Teacher Tenure Law in the School Code (Ill. Rev. Stat. 1985, ch. 122, par. 24—12); that is, that the primary purpose of teacher tenure is to provide priority job protection to tenured teachers "as against employees of lower priority status." Thus, they assert that the phrase "employee with less seniority" as used in section 3B—5 of the Community College Tenure Act must be read to include part-time instructors even though they acknowledge part-time instructors are not considered "faculty members" as that term is defined in section 3B—1 of the Community College Tenure Act. They assert that to do otherwise "would turn the Act on its head" since the colleges would be "free to displace those employees enjoying statutory protection by utilizing the unprotected part-timers."

We believe the teachers' position on this issue ascribes a far broader purpose to the Community College Tenure Act than that intended by the legislature. In *Birk v. Board of Education* (1984), 104 Ill. 2d 252, 257, the court construed the analogous section in the School Code. The court stated:

> "The primary purpose of the tenure provisions of the School Code is to give tenured teachers priority over nontenured teachers (*Bilek v. Board of Education* (1978), 61 Ill. App. 3d 323, 326), and, *as between tenured teachers*, to give priority to those with the longer length of continuing service (Ill. Rev.

Stat. 1981, ch. 122, par. 24—12). *** The legislature's goal in creating teacher tenure was to assure continuous service on the part of teachers of ability and experience by providing those teachers with some degree of job security. (*Johnson v. Board of Education* (1981), 85 Ill. 2d 338, 344; *Lenard v. Board of Education* (1979), 74 Ill. 2d 260, 268.) Thus, a tenured teacher is entitled to a reading of section 24—12 which is consistent with its prime purpose of protecting those who have qualified for its protections. (*Graham v. Board of Education* (1973), 15 Ill. App. 3d 1092, 1096.)" (Emphasis added.)

The teachers acknowledge that part-time instructors are not faculty members and have no job protection under the terms of section 3B—5 of the Community College Tenure Act, yet argue that such instructors fall within the meaning of "any other employee with less seniority" over whom tenured and nontenured teachers are to have job priority. Such argument necessarily presupposes that part-time instructors are employees capable of having seniority. It is clear, however, that part-time instructors do *not* accumulate seniority as that term is defined in appendix B of the collective bargaining agreement and as so testified by Dr. Viola. Consequently, a part-time instructor cannot be considered to be "any other employee with less seniority."

■■ Although it is true that words used in a statute should be given their plain, ordinary, and commonly accepted meaning, a plain word, such as "employee," may be given a restricted meaning if such is indicated by the act as a whole or by persuasive gloss of legislative history. (*Fleischer v. Board of Community College* (1984), 128 Ill. App. 3d 757, 760.) Viewing the Community College Tenure Act as a whole, we think such a restricted meaning must be placed on the word "employee" here to mean "any other *tenured* employee with less seniority." Consequently, we conclude that one of the premises on which the court's judgment was based—*i.e.*, that the phrase "any other employee with less seniority" includes part-time instructors—was erroneous.

We next consider the extent of the "bumping" rights afforded under section 3B—5 of the Community College Tenure Act: Do they extend to "any course that the protected faculty member is competent to teach or any other identifiable service which the faculty member is competent to render," as asserted by the teachers, or are they limited to a "position" entailing services the protected faculty member is "competent to render," as asserted by the board?

The teachers argue the use of the phrase "competent to render

[a service]" in section 3B—5 of the Community College Tenure Act provides evidence that a new and entirely different result was intended to be achieved by enactment of the Community College Tenure Act when that language is compared with the phrase "legally qualified [to hold a position]" in the Teacher Tenure Law in the School Code (Ill. Rev. Stat. 1985, ch. 24, par. 24—12). The effect of such language in the Teacher Tenure Law has consistently been construed to mean that an honorably dismissed teacher who is not "legally qualified" to fill the position held by a probationary or less senior tenured teacher has no right to have a school board "gerrymander" in order to create a position he could fill by taking only some of the different courses taught by other teachers in established teaching positions and combining them into one position comprised of several areas of instruction, all of which the dismissed teacher is qualified to teach. (See, *e.g., Peters v. Board of Education* (1983), 97 Ill. 2d 166; *Hancon v. Board of Education* (1985), 130 Ill. App. 3d 224; *Catron v. Board of Education* (1984), 126 Ill. App. 3d 693; *Higgins v. Board of Education* (1981), 101 Ill. App. 3d 1003.) "Position" was thus construed to mean that the tenured teacher had to be qualified to teach every course of which the teaching "position" consisted or, in terms of the instant cause, the teacher would have to be qualified as set forth in the college's "Qualifications to Teach."

This difference in the language, the teachers assert, shows the legislature intended to allow tenured community college faculty members job priority over not only nontenured faculty members and less senior employees holding *positions* entailing services the tenured employee was competent to render, but priority over those merely teaching a *course* ("rendering a service") which the tenured teacher was competent to render as well.

The board counters that the legislative history of the Community College Tenure Act is not supportive of the teachers' contention that a new and different result was intended since opponents of the Community College Tenure Act attacked it primarily on the basis the proposed act was too similar to elementary and secondary tenure practices (as opposed to the more difficult to achieve university tenure) and that it diminished the power of the local college district boards to establish tenure policies as provided in section 3—32 (Ill. Rev. Stat. 1985, ch. 122, par. 103—32). Further, the board asserts, use of the different terms ("legally qualified"/"competent to render a service") was necessary by virtue of the fact that primary and secondary teacher qualifications are determined in a centralized manner

by the State Board of Education (Ill. Rev. Stat. 1985, ch. 122, par. 21—1 *et seq.*), whereas the determination of faculty qualifications under the Public Community College Act is a decentralized process in that it is one of the individual community college's board's nondelegable discretionary powers (Ill. Rev. Stat. 1985, ch. 122, pars. 103—30, 103—42).

The teachers, in fact, acknowledge here that the use of the more liberal word "competent" rather than "legally qualified" was in recognition of the fact that no public body or agency is empowered to prescribe legal qualifications for teachers in community colleges as is the case with the State Board of Education for primary and secondary schools. In further argument, however, they state that tenured status would have no value if colleges were able to replace such tenured faculty with part-time instructors in order to achieve economic savings and contend that neither "precondition" as set forth in section 3B—5 of the Community College Tenure Act for the instant dismissals has been shown, *i.e.*, a decision to decrease the number of faculty members or to discontinue some particular type of teaching service or program. Such argument must be rejected outright, however, since it implies the board here acted improperly or with an unlawful motive in dismissing the teachers, and they have already stipulated that such was not the case. Stipulation, par. C.

The record is clear that part-time instructors are hired on a course-by-course basis to teach given courses as needed, whereas full-time teachers occupy a "position" in the curriculum. Part-time instructors are not hired for "positions"; when a reduction in faculty members occurs, the "positions" occupied by the honorably dismissed faculty members no longer exist. It was stipulated that the board and the teachers agreed to the "Qualifications to Teach" agreement and the respective "grandfather" clauses for faculty members and counselors hired prior to December 20, 1983. (Stipulation, pars. E, F.) The faculty federation president, Ronald Gilkerson, accepted the recommendations of the committee establishing the guidelines, standards, and procedures for academic quality set forth in the "Qualifications to Teach." The collective bargaining agreement was entered into by and between the board and the faculty federation as the exclusive bargaining agent for the faculty members in the bargaining unit. "Faculty members" are *full-time employees* of the district *regularly engaged* in teaching or academic support services. Part-time instructors are not covered by the agreement. Part-time instructors are excluded from the definition of " 'educational employee' or 'employee' " in the Illinois Educational Labor Relations Act (Ill. Rev.

Stat. 1985, ch. 48, par. 1702) and, by implication, part-time instructors have no right to collectively bargain (Ill. Rev. Stat. 1985, ch. 48, par. 1703).

Although the teachers argue the collective-bargaining agreement "says nothing about a faculty member supplementing his/her teaching schedule with courses outside of the faculty member's specialty," the board asserts and the agreement explicitly sets forth provisions for such "supplementary work" for counselors, and for full-time faculty members, the "extra income" items such as summer school, extracurricular activities, interim session, overload, telecourse, independent study, substitutes, and program coordinator.

The parties here collectively bargained in order to reach the agreement which specifically states that "[t]enure shall be granted to faculty members in accordance with the Illinois Community College Act, Illinois Revised Statutes Chapter 103B—1, et seq., and Appendix B of this Agreement." We find nothing in the provisions of the collective bargaining agreement dealing with tenure which might be construed as a diminishment of the tenure rights afforded community college faculty members under the statute. As the teachers note, such a diminishment would be contrary to the provisions of the Educational Labor Relations Act (Ill. Rev. Stat. 1985, ch. 48, par. 1710(b)).

Appendix B of the collective-bargaining agreement supplements the provisions of section 3B—5 of the Community College Tenure Act (Ill. Rev. Stat. 1985, ch. 122, par. 103B—5). As emphasized in the excerpt from appendix B concerning reduction in the number of full-time faculty members, those tenured members who are to be honorably dismissed are given the opportunity to notify the board of "*any position(s), held* by nontenured faculty members, or any other employees with less seniority which such faculty member believes he/she is *competent to fill.*" (Emphasis added.) The determination of whether such member is, in fact, "competent to render the services for the position or positions identified by the tenured faculty member" is the responsibility of the board.

We find the provisions of appendix B consistent with the essence of section 3B—5, which provides the tenured faculty member freedom from termination in a retrenchment while there are probationary or less senior teachers being retained to render a service which the tenured faculty member is competent to render. In order to be "retained," one must currently be filling a position, and in order for the freedom from termination afforded tenured teachers to have any value, it must operate vertically within one's own academic disci-

pline.

The collective bargaining agreement sets forth no specific policies concerning the faculty members' recall rights as set forth in the latter part of section 3B—5 (Ill. Rev. Stat. 1985, ch. 122, par. 103B—5). The recall rights of tenured faculty members provided therein are consistent with the retention rights, to wit: "the preferred right to reappointment to *a position* entailing services he is competent to render." (Emphasis added.) The statute provides that *any* faculty member (including nontenured) shall have a preferred right to reappointment to a position as against any *new* faculty member, but tenured faculty members have a preferred right to reappointment to a position as against any nontenured or less senior employee.

For lack of any precedent on this issue, the board provided us with a copy of an arbitration opinion and award which construed section 3B—5 of the Community College Tenure Act and which was consistent with its own interpretation. The teachers neither acknowledge nor object to the opinion. Nonetheless, it is an unreported opinion, and it may not be afforded any precedential value here.

We have, however, found merit in the board's argument, and conclude that section 3B—5 does not warrant the interpretation advanced by the teachers that the right of tenured faculty members to bump nontenured or less senior employees includes the right to bump them from certain *courses* as opposed to the *positions* in the college curriculum which are held by them.

Accordingly, we find:

1) The court's judgment that Neil Newlon is entitled to bump from Speech 100 teaching assignments first, any part-time instructor of that course and, second, any probationary or less senior teachers whose course load consists solely of Speech 100, must be reversed. As such, that portion of the court's judgment concerning the compensation to be received by Newlon is moot.

2) The court's judgment that Robert Biggiam and James Moreland are entitled to bump any part-time instructors or probationary or less senior teachers of welding must also be reversed. Again, the matter of compensation is moot.

3) The court's judgment that Judith Vargas is entitled to bump only in regard to counseling positions as per article VIII, section B, of the collective bargaining agreement and is not qualified under the "Qualifications to Teach" regarding psychology must be affirmed. That portion of the court's judgment entitling her to preference over part-time counseling positions is reversed.

4) The court's judgment that Jon Pigage was outside the protection of section 3B—5 of the Community College Tenure Act is reversed insofar as Pigage has recall rights as against any *new* faculty member as provided therein.

The judgment of the circuit court of Kane County is reversed in part and affirmed in part.

*Reversed in part; affirmed in part.*

REINHARD and INGLIS, JJ., concur.